IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

REGINALD JOHNSON
   *Plaintiff,*

v.

OFFICER MUSE HAMMETT, *et al.*,
   *Defendants.*

Civil Action No. ELH-18-1059

## MEMORANDUM OPINION

This civil rights suit arises from an unfortunate incident of mistaken identity that resulted in the detention of plaintiff Reginald Johnson for about two days. He has filed a First Amended Complaint against Officer Muse Hammett,[1] a police officer employed by the Maryland Transportation Authority ("MDTA"), and Officer Terrell Dickerson, a police officer employed by the State of Maryland. ECF 29 (the "Amended Complaint").[2]

The suit is rooted in a traffic stop conducted by Hammett on May 13, 2015, based on a speeding violation committed by Johnson (ECF 29, ¶¶ 13, 14), and the subsequent detention of

---

[1] Officer Hammett states that his first name is "Musa," not "Muse." ECF 34; ECF 34-1 at 2 n. 3. The Clerk shall correct the spelling on the docket.

[2] Plaintiff refers to Dickerson as "a police officer employed by the State of Maryland." ECF 29, ¶ 6. According to Dickerson, he is a "Correctional Officer" employed by the Maryland Department of Public Safety and Correctional Services ("DPSCS"). ECF 45-1 at 2.

Plaintiff also sued Police Officer Robert R. Wallner. ECF 29. However, on May 28, 2019, plaintiff filed a notice of voluntary dismissal as to Officer Wallner, pursuant to Fed. R. Civ. P. 41(a)(1). ECF 40. The same day, I entered an Order dismissing the suit as to Wallner, without prejudice. ECF 42.

Johnson as "a possible fugitive from Albuquerque, New Mexico." *Id.* ¶ 24. Plaintiff was not a fugitive. However, he was not released until about 51 hours after his arrest.[3]

Suit was instituted pursuant to 42 U.S.C. § 1983. Plaintiff asserts violations of his Fourth Amendment right to be free from unreasonable searches and seizures; his Fifth and Fourteenth Amendment rights to equal protection and substantive due process; and his Eighth Amendment right to be free from cruel and unusual punishment. *Id.* ¶¶ 48–53.

Pending before the Court are two motions to dismiss. ECF 34; ECF 45. Pursuant to Fed. R. Civ. P. 12(b)(6), Officer Hammett has moved to dismiss (ECF 34), supported by a memorandum of law (ECF 34-1) (collectively, the "Hammett Motion"). Hammett asserts that the Amended Complaint has failed to state a claim and that he is entitled to qualified immunity. ECF 34-1 at 8–15. Johnson opposes the Motion. ECF 35 (the "Hammett Opposition"). Hammett has replied. ECF 36 (the "Hammett Reply").

Officer Dickerson has also moved to dismiss (ECF 45), supported by a memorandum of law (ECF 45-1) (collectively, the "Dickerson Motion"). He urges dismissal of the Amended Complaint on the grounds that plaintiff has failed to state a claim under Fed. R. Civ. P. 12(b)(6) and he is entitled to qualified immunity. ECF 45-1. Johnson opposes the motion. ECF 49 (the "Dickerson Opposition"). Dickerson has replied. ECF 56 (the "Dickerson Reply").

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant both motions.

---

[3] The Amended Complaint is not entirely clear on the length of Johnson's detention. He was stopped at approximately 4:30 p.m. on May 13, 2015. ECF 29, ¶ 13. At 1:00 a.m. on May 14, 2015, Johnson met with the commissioner. *Id.* ¶ 34. He was told he would go before a judge at 8:30 a.m. that morning (*id.* ¶ 37), but the hearing was cancelled. *Id.* ¶ 41. Plaintiff asserts: "On or about 7:30 PM the next day, Plaintiff was told he was being released. . . ." *Id.* ¶ 46. Presumably, by "the next day," plaintiff means May 15, 2015. This equates to a detention of about 51 hours.

# I.    Background[4]

At approximately 4:30 p.m. on May 13, 2015, Johnson was driving on Interstate 95 when he was stopped by Officer Hammett for speeding.  ECF 29, ¶ 13.  Officer Hammett told plaintiff that he was speeding, and that "he would need to see [plaintiff's] license and registration."  *Id*. ¶ 14.  Johnson "complied with Defendant Hammett's request."  *Id*. ¶ 15.  About three minutes later, "Defendant Hammett came back to Plaintiff's car and asked him to step out."  *Id*. ¶ 16.  Again, Johnson "complied with Defendant Hammett's request."  *Id*. ¶ 17.

Officer Hammett then "ask[ed] Plaintiff if he had ever been to New Mexico."  *Id*. ¶ 18.  Johnson responded that "he had not been to New Mexico."  *Id*. ¶ 19.  Johnson "proceeded to ask Defendant Hammett if this was about another individual named Reginald Johnson."  *Id*. ¶ 20.  Johnson explained that "he had a similar problem trying to get his passport approximately four ('4') years before the stop."  *Id*.  Further, Johnson told Officer Hammett that the previous mix-up was resolved when he "brought documentation showing who he was, and the [official] had a picture of the 'other' Reginald Johnson."  *Id*. ¶ 21.  To this, Officer Hammett allegedly responded, "'Ok' or something to that effect and told Plaintiff to get back into the car."  *Id*. ¶ 22.[5]

 Shortly thereafter, Officer Hammett "called for backup."  *Id*. ¶ 23.  After additional officers arrived at the scene, "Plaintiff was placed in handcuffs" and he was told that "he was a possible fugitive from Albuquerque, New Mexico."  *Id*. ¶ 24.  Johnson "asked Defendant Hammett if there [was] any way to get a picture of the 'other' Reginald Johnson because he believed that

---

[4] In view of the procedural posture of the case, I must accept as true the facts alleged in the Complaint.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

[5] The suit does not indicate whether Hammett ever issued a traffic citation to plaintiff for speeding.

would clear everything up." *Id.* ¶ 25. According to Johnson, Hammett then "called someone on the radio, but [Johnson] was unable to hear what was discussed." *Id.* ¶ 26. Thereafter, Johnson was transported to the Baltimore City Central Booking and Intake Center ("Central Booking").[6] *Id.* ¶ 27.

Before Johnson entered Central Booking, "Defendant Hammett said that if plaintiff's finger prints [sic] displayed 'no hits' that they would not hold him and that he would take Plaintiff back to his car." *Id.* ¶ 28. According to plaintiff, he "was fingerprinted and the monitor showed no hits." *Id.* ¶ 29. Nevertheless, "a supervisor," allegedly Dickerson, told Johnson that "they would have to keep him." *Id.* ¶ 30. Johnson avers that he again "asked officials to get the picture of the 'other' Reginald Johnson." *Id.* ¶ 31. According to Johnson, an "unknown woman" then told him "something to the effect of 'It is you and you are a fugitive from New Mexico and you will see the commissioner after 12:00AM, so you can take it up with him.'" *Id.* ¶ 32.

According to Johnson, his photograph and additional fingerprints were taken, and he was then placed in a jail cell with another person. *Id.* ¶ 33. At approximately 1:00 a.m., Johnson met with "an unknown commissioner," and Johnson asked him about the photo and the social security number. *Id.* ¶ 34. In response, the unidentified commissioner allegedly said "that he could not do anything about it and Plaintiff was a fugitive from New Mexico." *Id.* ¶ 35. The commissioner then asked Johnson "several questions about his occupation, marital status, income, and living arrangement." *Id.* ¶ 36. Johnson responded to the questions, and the "commissioner indicated that Plaintiff would go before a judge in the morning at around 8:30AM to be extradited back to New

---

[6] The Baltimore Central Booking and Intake Center is operated by DPSCS, as part of its Division of Pretrial Detention and Services. *See* http://dpscs.maryland.gov/pretrial-detention/. *See also* Md. Code (2017 Repl. Vol.), § 5-201(b)(3) of the Correctional Services Article.

Mexico." *Id.* ¶ 37. Johnson was then placed in a group cell "with about ten ('10') other inmates for several hours." *Id.* ¶ 38.

Later, Johnson "was given a psychological test, a prison suit, and breakfast." *Id.* ¶ 39. Then, he was taken to another area of Central Booking, where he was "placed in another cell with another person who had multiple convictions for drugs, armed robbery, and gun possession for the rest of the night." *Id.* ¶ 40.

In the morning, when Johnson was "supposed to appear before a judge," court officials told him that he "was not on the list." *Id.* ¶ 41. No one was able to explain to Johnson why his "hearing was cancelled." *Id.* ¶ 43. For several more hours, Johnson sat in the holding cell "until he was called out for officials to draw his blood for a syphilis determination." *Id.* ¶ 44. Once again, Johnson asked when he would see a judge, "but no one could tell Plaintiff anything." *Id.* ¶ 45.

At "about 7:30 p.m. the next day, Plaintiff was told he was being released" but first "had to sign some paperwork . . . ." *Id.* ¶ 46. At approximately 8 p.m., Johnson was released, "without an apology." *Id.* ¶ 47.

This suit followed on April 12, 2018. ECF 1. The original Complaint named five defendants: the Maryland Department of Transportation ("MDOT"), doing business as the Maryland Transit Administration ("MTA"); "John Doe #1," a Maryland Transportation Authority officer; "John Doe #2," an MDTA supervisor; "Jane Doe #3," an MDTA employee; and "John Doe #4," an MDTA commissioner (collectively, the "Doe Defendants"). *Id.*

The MDOT, the MTA, and the MDTA (collectively, the "State") moved to dismiss Johnson's Complaint. ECF 3. The State asserted that the Eleventh Amendment barred the suit, and that Johnson failed to state a claim upon which relief may be granted. *Id.* at 3-6. Johnson opposed the motion and sought "limited discovery" to identify the Doe Defendants. ECF 7.

By Memorandum Opinion (ECF 18) and Order (ECF 19) of November 21, 2018, I granted the State's motion in part and denied it in part. ECF 18 at 2. In particular, I dismissed Johnson's claims against the MDOT, inclusive of the MTA and the MDTA, finding that these agencies are arms of the State and therefore entitled to sovereign immunity. *Id.* at 11, 14. However, I "permitted limited discovery for the sole purpose of enabling plaintiff to determine the identities of [the Doe Defendants]. . . ." *Id.* at 18. Thereafter, plaintiff filed the Amended Complaint (ECF 29), identifying the individual defendants.

Additional facts are included in the Discussion.

## II. Legal Standard

### A. Rule 12(b)(6)

As noted, both Hammett and Dickerson move to dismiss Johnson's suit under Fed. R. Civ. P. 12(b)(6). A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440

(4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Ordinarily, courts do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.'" Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*). Moreover, the Fourth Circuit has observed that "where the motion to dismiss involves 'a civil rights complaint,'" the court "'must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which

might plausibly be suggested by the facts alleged.'" *Carter v. Baltimore County, Maryland*, 39 F. App'x 930, 934 (4th Cir. 2002) (citing *Edwards*, 178 F.3d at 244) (internal citation omitted) (emphasis in original).

In resolving a Rule 12(b)(6) motion, a court "may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor and City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see* Fed. R. Evid. 201(b) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 6367 F.3d 462, 466 (4th Cir.), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Accordingly, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *cf. Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) (noting that the court may take judicial notice of information on a website, "so long as the web site's authenticity is not in dispute"). However, "these facts [must be] construed in the light most favorable" to the nonmovant. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).

The "most frequent use of judicial notice of ascertainable facts is in noticing the content of court records." *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989). Accordingly, in resolving the motions, I have taken judicial notice of the Albuquerque District Court's docket for the case against the "other" Reginald Johnson (State of New Mexico v. Reginald Johnson, Case

No. D-202-CR-201103805).[7]  The New Mexico court's docket sheet reflects that a bench warrant was issued on August 8, 2011, and was cancelled on May 19, 2015, *after* the plaintiff in this case was detained.

### III.  Discussion

### A.  Section 1983 Generally

Plaintiff's suit is predicated on 42 U.S.C. § 1983.   Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1893 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area*

---

[7] The docket sheet is available at https://caselookup.nmcourts.gov/caselookup.

*Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Hammett was "exercising power possessed by virtue of state law" as an officer employed by the MDTA when he stopped plaintiff for speeding and subsequently arrested him pursuant to the New Mexico warrant. Likewise, Dickerson was acting "with the authority of state law" as an officer of the Department of Public Safety and Correctional Services when he detained plaintiff post-arrest. The defendants do not dispute that they were acting under color of law.

## B. Qualified Immunity

Both Officer Hammett and Officer Dickerson have asserted that they are protected from suit by qualified immunity. ECF 34-1 at 13; ECF 45-1 at 9.

The doctrine of qualified immunity "'balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials

from harassment, distraction, and liability when they perform their duties reasonably.'" *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). Put another way, "[q]ualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Humbert v. Mayor and City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016). In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The cases are legion in support of this proposition. *See, e.g.*, *District of Columbia v. Wesby*, 583 U.S. ___, 137 S. Ct. 577, 589 (2018); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Gilliam v. McCollum*, 932 F.3d 216, 229 (4th Cir. 2019); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 219 (4th Cir. 2018); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S.

1068 (2012).

"The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam). Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, 457 U.S. at 818, and so an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). In other words, qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Put another way, qualified immunity "takes cognizance of human imperfections," *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014), and protects government officials from liability for "'bad guesses in gray areas.'" *Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (citation omitted); *see Safar*, 859 F.3d at 245. And, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.

Notably, qualified immunity is an "'*immunity from suit* rather than a mere defense to

liability[.]'" *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*); *see Gilliam*, 932 F.3d at 229.  Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'"  *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526).  However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'"  *Henry v. Purnell*, 501 F.3d, 374, 377 n.2. (4th Cir. 2007).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question."  *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island, NC*, 891 F.3d 489, 497 (4th Cir. 2018).  Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'"  *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Owens,* 767 F.3d at 395-96.  The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Labowitz*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate

whether the right at issue was 'clearly established' at the time of the officer's conduct.[] Accordingly, even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)) (other citation omitted); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue. *Scinto,* 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand

that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640). Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens*, 767 F.3d at 399.

Generally, to "determine whether a right is clearly established", courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (citation omitted); *see Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 574 U.S. at 16–17 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, 584 U.S. ___, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly,* 580 U.S. ___, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan*, 575 U.S. ___, 135 S. Ct. 1765, 1774 (2015); *Plumhoff v. Rickard*, 572 U.S. 765,778-79 (2014); *see also Reichle*, 132 S. Ct. at 2093 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017). Indeed, the Supreme Court has

never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d, at 582-83. But, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 135 S. Ct. at 1775-76; *Plumhoff*, 572 U.S. at 779. Rather, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, 577 U.S. ___, 136 S. Ct. 305, 308 (2015)) (per curiam).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

### C. Analysis

### 1.

Johnson's suit contains factual allegations as to Officer Hammett regarding the traffic stop, arrest, and the comment made by Hammett while he was transporting plaintiff to Central Booking. Officer Dickerson is named once in the Amended Complaint. As to him, plaintiff merely asserts that when his fingerprints came back negative, "a supervisor believed and therefore averred to be

either Defendant Dickerson and/or Defendant Wallner said to Plaintiff that they would have to keep him." ECF 29, ¶ 30.

Plaintiff concedes that he "is not bringing an Eighth Amendment claim against Defendant Hammett at this time." ECF 35 at 6 n.3. Notably, the Eighth Amendment has no application in the context of an individual who is detained in a preconviction context. *See Slade v. Hampton Roads Regional Jail*, 407 F.3d 243, 250 (4th Cir. 2005) (citing *City of Revere v. Mass. General Hosp.*, 463 U.S. 239, 244 (1983)). Rather, the Due Process Clause of the Fourteenth Amendment protects the constitutional rights of pretrial detainees. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Therefore, there is no basis here for any claim under the Eighth Amendment.

## 2.

Plaintiff deploys largely the same arguments as to both Hammett and Dickerson. Johnson does not challenge the legality of the traffic stop. But, he asserts that there are "factual questions surrounding the 'mistaken identity' arrest . . . ." ECF 35 at 13. He maintains that qualified immunity may not apply in instances where the officer has failed "'to investigate *readily available* exculpatory evidence.'" *Id.* at 12 (citing *Brown v. Wiita*, 7 F. App'x 275, 279 (4th Cir. 2001)) (emphasis in brief).

Johnson relies, *inter alia*, on the Supreme Court's decision in *Baker v. McCollan*, 443 U.S. 137 (1979), characterizing it as the "genesis" of mistaken identity claims. ECF 35 at 6. And, he contends that advances in modern technology now make it easier to determine identity than when *Baker* was decided in 1979. *Id.* at 7–8. Thus, he asserts that "in 2019, it is difficult to believe that Defendant Hammett would have been unable to quickly confirm that he had the wrong man from his patrol vehicle with the modern technology available to him and his colleagues." *Id.* at 11–12. Moreover, plaintiff maintains that Dickerson had an obligation to take "remedial action" once

plaintiff's fingerprint check came back negative, including "inform[ing] a supervisor that Plaintiff may be the wrong person" or "continu[ing] with a follow-up investigation with the out-of-state warrant."). ECF 49 at 11.

In *Baker*, Leonard McCollum duplicated the driver's license of his brother Linnie McCollum, substituting his own photograph. Leonard was arrested on narcotics charges and told police he was Linnie. *Baker*, 443 U.S at 140–41. He was released on bail. *Id.* at 141. A warrant was subsequently issued for his arrest. *Id.* Some time later, Linnie was pulled over for a traffic violation. *Id.* Because his identifying information matched that in police records, police thought Linnie was the person subject to the warrant. *Id.* Linnie was detained for three days over New Year's weekend. *Id.*

Linnie sued the sheriff. Although he did not contest the traffic stop or the validity of the underlying warrant, *id.* at 143, he claimed that the sheriff was not entitled to qualified immunity because he acted unreasonably by his "failure to institute an identification procedure that would have disclosed the error." *Id.* at 141–42. The Supreme Court concluded that Linnie's constitutional rights had not been violated. *Id.* at 144. The Court observed that, "depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of liberty without due process of law . . ." *Id.* at 145.

Of import here, the Court observed, *id.*: "[W]e are quite certain that a detention of three days over a New Year's weekend does not and could not amount to such a deprivation." *Id.* at 145. Further, the Court said: "[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is

based on mistaken identity or a defense such as lack of requisite intent." *Id.* at 145–46. It added that the "official charged with maintaining custody of the accused name in the warrant" is not "required by the Constitution to perform an error-free investigation of such a claim." *Id.* at 146.

Plaintiff highlights Justice Blackmun's concurrence, stating that there could be a due process violation where the "'sheriff. . . deliberately and repeatedly refused to check the identity of a complaining prisoner against readily available mug shots and fingerprints.'" ECF 35 at 8 (quoting *Baker*, 443 U.S. at 148). Johnson also details how federal courts, none from this circuit, have dealt with "mistaken identity" cases since *Baker*. In those cases, the plaintiffs had been held anywhere from 12 to 41 days. He relies on a series of Ninth Circuit cases, and in particular *Alvarado v. Bratton*, 299 F. App'x 740 (9th Cir. 2008).

The plaintiff in *Alvarado* alleged that law enforcement had "identification technology that makes misidentification even easier to catch, but that they refuse to use it despite 'routinely' arresting and detaining the wrong people because of the similarity of their names." *Id.* at 743. The Ninth Circuit concluded that allegations that plaintiff informed law enforcement of the mistaken identity, combined with law enforcement's failure to conduct "simple identification procedures," amounted to an adequately pleaded claim of due process violation. *Id.* at 742–43.

Johnson contends that dismissal of the suit would be premature because he is entitled to discovery to determine whether defendants acted with deliberate indifference to his claim of mistaken identity. *See* ECF 35 at 11. For example, he seeks to determine whether or when the officers had a photograph of the New Mexico fugitive; whether they communicated with anyone in New Mexico; and why he remained detained after his fingerprints came back negative. *Id.* In essence, Johnson maintains that defendants took too long to determine that he was not the fugitive.

**3.**

Hammett's role, as alleged by plaintiff, was limited. He effectuated the traffic stop, and plaintiff does not challenge the legality of the stop. During the traffic stop, Hammett learned of the fugitive warrant in the name of Reginald Johnson; detained plaintiff at the scene; and subsequently transported plaintiff, in handcuffs, to Central Booking for processing. Hammett allegedly told plaintiff that if his fingerprints "displayed 'no hits' that they would not hold him and that he would take Plaintiff back to his car, which was left on the side of the road. ECF 29, ¶ 28. According to plaintiff, although the fingerprints revealed "no hits," a "supervisor" told plaintiff "that they would have to keep him." *Id.* ¶¶ 29, 30. In other words, and critically, plaintiff acknowledges that Hammett was not the one who made the decision to continue the detention of plaintiff.

Hammett argues that the Amended Complaint "does not assert a claim that [he] acted unlawfully or violated Plaintiff's constitutional or civil rights." ECF 34-1 at 8. Hammett points out that plaintiff has not alleged that the traffic stop was unlawful. *Id.* at 9. Indeed, he maintains that he had probable cause to stop plaintiff and to detain him. *Id.* at 10. Therefore, in his view, neither the stop nor the arrest violated plaintiff's Fourth Amendment rights. *Id.* at 11.

Further, Hammett observes that the Amended Complaint "does not allege that Plaintiff was held without legal justification; it merely alleges that Plaintiff's fingerprint test showed 'no hits'. . . This contention does not rise to the level of an allegation that Officer Hammett confined Plaintiff without legal justification." *Id.* at 11. Hammett also contends that he cannot be liable for plaintiff's subsequent detention by Central Booking. *Id.* at 10.

According to Hammett, even if the traffic stop and subsequent arrest amounted to a constitutional violation, his conduct was objectively reasonable and "no reasonable officer could

have possibly concluded that the arrest of Plaintiff was a violation of constitutional rights." *Id.* at 14. Because Hammett's "actions comported with clearly established Maryland law regarding the service of warrants," ECF 36 at 4, he maintains that he is, in any event, entitled to qualified immunity. ECF 34-1 at 13–15.

The allegations do not support a claim against Hammett. Even by plaintiff's own allegations, it was not Hammett who continued to detain Johnson after the fingerprint check allegedly came back negative.

The Fourth Amendment protects against unreasonable searches and seizures. *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). When a police officer stops an automobile and detains the occupant, the stop constitutes a seizure that implicates the Fourth Amendment, even if the purpose of the stop is limited and the detention is brief. *See, e.g., Brendlin v. California*, 551 U.S. 249, 255 (2007); *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018); *United States v. Sowards*, 690 F.3d 583; 588-89 (4th Cir. 2012); *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015); *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).

In general, a traffic stop begins when a car "is pulled over for investigation of a traffic violation." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). If the police have probable cause or reasonable articulable suspicion that a driver has committed a traffic violation, the stop of the driver ordinarily does not violate the Constitution, so long as the stop is no longer than necessary to perform the traditional incidents of a routine traffic stop. *Prouse*, 440 U.S. at 650; *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009). In *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019), the Court reiterated: "'When an officer observes a

traffic offense – however minor – he has probable cause to stop the driver of the vehicle.'" (quoting *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014)).

*Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny permit a police officer to stop a motorist for investigative purposes, without violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, so long as there is reasonable, articulable suspicion, or probable cause, based on specific facts, that criminal activity is afoot. *Id.* at 30. Because a traffic stop is more akin to an investigative detention than a custodial arrest, the Supreme Court has adopted the dual inquiry standard articulated in *Terry*, 392 U.S. 1, to assess the constitutionality of the stop. *See Johnson*, 555 U.S. at 330-31; *Bernard*, 927 F.3d at 805; *Bowman*, 884 F.3d at 209; *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016); *Williams*, 808 F.3d at 245; *United States v. Guijan-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011).

Under the dual inquiry standard, the court examines "whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Sharpe*, 470 U.S. at 682; *see also Bernard*, 927 F.3d at 805; *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017); *Williams*, 808 F.3d at 245; *Guijon-Ortiz*, 660 F.3d at 764; *Digiovanni*, 650 F.3d at 507 (4th Cir. 2011).

"Reasonable suspicion" is "an objective standard." *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2014). It is "a particularized and objective basis for suspecting the person stopped of criminal activity. . . ." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). *See United States v. Black,* 707 F.3d 531, 539 (4th Cir. 2013); *United States v. Massenburg*, 654 F.3d 480, 486 (4th Cir. 2011); *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009). It "is a less demanding standard then probable cause and requires a showing considerably less than preponderance of the evidence," but a "minimal level of objective justification [is required] for

making the stop." *Illinois v. Wardlow*, 527 U.S. 199, 123 (2000); *see United States v. Lawing,* 703 F. 3d 229, 236 (4th Cir. 2012); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000). Because the reasonable suspicion standard is an objective one, the officer's subjective state of mind is not considered. *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011).

Plaintiff's Fourth Amendment rights were not violated by Hammett's traffic stop. The Amended Complaint states that Hammett pulled Johnson over on Interstate 95 for "speeding." ECF 29, ¶ 14. A stop is "supported by reasonable suspicion" when the officer witnesses the suspect "speeding on the highway." *United States v. Buie*, 441 F. App'x 173, 176 (4th Cir. 2011). As indicated, plaintiff does not contend, either in the Amended Complaint or in the Hammett Opposition, that the initial traffic stop was unlawful.

In connection with the traffic stop, Hammett detained Johnson pursuant to a fugitive warrant from New Mexico for a person with the same name as plaintiff. Johnson does not dispute the validity of the warrant. Rather, he contends that Hammett acted unreasonably in failing to verify whether plaintiff was the person for whom the warrant was issued. ECF 35 at 11.

An arrest due to "mistaken identity," pursuant to a facially valid warrant, does not amount to a constitutional violation. As the Court said in *Baker*, an officer "executing an arrest warrant" is not "required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." *Baker*, 443 U.S. at 146. Courts in the Fourth Circuit have consistently stated as much. *See Peacock v. Mayor and City Council of Baltimore*, 199 F. Supp. 2d 306, 309 (D. Md. 2002) ("It is well established that when an arrest and subsequent detention are undertaken pursuant to a facially valid warrant, there is no violation of the Fourth Amendment."); *see also Mitchell v. Aluisi*, 872 F.2d 577, 579

(4th Cir. 1989); *Turner v. Kight*, 192 F. Supp. 2d 391, 403–04 (D. Md. 2002); *Carter v. Mayor and City Council of Baltimore*, 164 F. Supp. 2d 509, 516 (D. Md. 2001); *Brooks v. Prince George's County*, HAR-90-3073, 1992 WL 63393, at *1 (D. Md. 1992). *Cf. Green v. Brooks*, 125 Md. App. 349, 373-74, 725 A.2d 596, 608-609 (1999) (concluding that there was no liability under Maryland law for police officer who arrested the wrong person pursuant to a facially valid warrant).

*Brown v. Wiita*, *supra*, 7 F. App'x 275, provides guidance. In *Brown*, the plaintiff was mistakenly arrested and protested his innocence throughout the arrest. *Id.* at 277. He argued that the arresting officer was not entitled to qualified immunity because "he had failed to take additional steps to verify" that the plaintiff was the person sought. *Id.* at 278. Specifically, he claimed that the officer should have waited for the photograph of the person who was the subject of the warrant or contacted the officer who was the source of the warrant's description of the suspect before making the arrest. *Id.* The Court determined that principles of reasonableness "compel the conclusion that [the officer's] belief that [the plaintiff] was the individual identified in the arrest warrant was objectively reasonable in light of the circumstances as they appeared to [the officer] at the time he ordered appellee's arrest." *Id.* at 279. The Court specifically noted that although the arrestee "protested his innocence" and the officer "could have waited to receive the . . . photograph," this "does not detract from the reasonableness of [the officer's] belief that he was arresting the correct person." *Id.*

Here, the Amended Complaint does not contain factual allegations to the effect that Hammett could have quickly accessed information about the New Mexico fugitive so as to eliminate the concern that plaintiff was the fugitive, yet chose not to do so. In the Hammett Opposition, plaintiff speculates about whether Hammett had a photograph of the New Mexico fugitive and whether Hammett spoke to other law enforcement officials at the time of the arrest.

ECF 35 at 11. These are not allegations in the Amended Complaint, however. *See, e.g.*, *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (noting that "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)). Plaintiff also states that "discovery will reveal whether it is 'plausible' that Defendant Hammett acted with a kind [of] deliberate indifference." *Id.* at 11. But, a law suit is not a fishing expedition; plausibility must be established by the Amended Complaint.

An arrest pursuant to a facially valid warrant, even if it is the product of mistaken identity, does not give rise to a constitutional violation. And, plaintiff points to no authority that required Hammett to investigate plaintiff's claims of mistaken identity at the scene, before transporting him to Central Booking. To the contrary, it was reasonable for Hammett to conclude, on the basis of the information available to him, that plaintiff was a fugitive from New Mexico. *Brown*, 7 F. App'x at 280. The Supreme Court "has declined to hold that 'a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence.'" *Mitchell*, 872 F.2d at 579 (quoting *Baker*, 443 U.S. at 145-46).[8]

**4.**

As noted, the Amended Complaint contains only one reference to Dickerson: that "a supervisor believed and therefore averred to be . . . Defendant Dickerson . . . said to Plaintiff that they would have to keep him" even though Johnson's fingerprint screen at Central Booking allegedly came back negative. ECF 29, ¶ 30.

---

[8] Arguably, Hammett could have been in dereliction of his duty if he did not transport plaintiff to Central Booking while the matter of identity was sorted out.

Dickerson posits that plaintiff has not alleged that he violated any constitutional right or "acted in an unlawful manner." ECF 45-1 at 6. He also asserts that the single allegation as to him is "insufficient to support a constitutional claim." ECF 56 at 3–4.

According to Dickerson, he had no duty to investigate "the underlying circumstances of [plaintiff's] arrest." ECF 45-1 at 7. In addition, he argues that, "even if Mr. Johnson had alleged facts setting forth an actionable claim that Correctional Officer Dickerson violated a constitutional right, Dickerson would still be entitled to qualified immunity" because his actions were objectively reasonable in light of the information he had at the time, and the fact that he believed he lacked the legal authority to release plaintiff. *Id.* at 11–12. And, Dickerson emphasizes that the suit fails to allege that Dickerson "knew that Plaintiff was not the subject of the warrant on which he had been arrested." ECF 56 at 3.

Plaintiff's arguments regarding *Baker* are mostly applicable to his post-arrest detention and, therefore, to Dickerson. But, the "official charged with maintaining custody of the accused named in the warrant" is not "required by the Constitution to perform an error-free investigation" of a claim of innocence. *Baker*, 443 U.S. at 146. Indeed, plaintiff's "innocence of the charge contained in the warrant . . . is largely irrelevant to his claim of deprivation of liberty without due process of law." *Id.* at 145. Furthermore, plaintiff's reliance on *Alvarado* is misplaced. The Ninth Circuit distinguished that case from *Baker* by noting that authorities there "failed to perform simple identification checks. . . ." *Alvarado*, 299 F. App'x at 742. That is not the case here, as plaintiff alleges that he was fingerprinted twice. Further, the court in *Alvarado* based its conclusion in part on the fact that the defendants had in their possession technology that would cut down on misidentifications, but refused to use it. *Id.* at 743. The Amended Complaint contains no similar allegation.

It does not appear that the Fourth Circuit has ever "squarely addressed the issue of whether prolonged detention due to a failure to investigate amounts to a constitutional violation," although "other circuits have recognized the 'Fourteenth Amendment due process right to be free from continued detention after it . . . *should have been known that the detainee was entitled to release*' had an investigation of exculpatory evidence been conducted." *Small v. Tate*, 2:18cv315, 2019 WL 446594, at *6 (E.D. Va. Jan 29, 2019) (quoting *Russo v. Bridgeport*, 479 F.3d 196, 207 (2d Cir. 2007) and collecting cases) (emphasis in *Tate*).  Notably, "[f]or the detention to implicate due process concerns, the circuits that have recognized such a right require that officers 'acted with something akin to deliberate indifference. . . *where officers were in possession of exculpatory evidence*.'" *Tate*, 2019 WL 446594, at *6 (quoting *Seales v. City of Detroit*, 724 F. App'x 356, 363 (6th Cir. 2018)) (emphasis in *Tate*).  Further, the circuits that have recognized "a due process right to be free from continued detention after an investigation would have established that the detainee was entitled to release, also require that the evidence is clearly exculpatory." *Tate*, 2019 WL 446594, at *7.  And, "these circuits' tests require courts to evaluate a variety of factors or the circumstances as a whole." *Id.*  In *Russo*, 479 F.3d at 209, for example, the court required an analysis of "(1) the length of time of [a plaintiff's] wrongful incarceration, (2) the ease with which the evidence exculpating [a plaintiff]—which was in the officer's possession—could have been checked, and (3) the alleged intentionality of [the officers'] behavior."

To be sure, liability can attach when officers "act in an objectively unreasonable manner in the circumstances, as for example, in failing to investigate readily available exculpatory evidence." *Brown*, 7 Fed. App'x at 279 (citing *Clipper v. Takoma Park*, 876 F.2d 17 (4th Cir. 1989)).  And, the Fourth Circuit has acknowledged the inapplicability of *Baker* in cases where there is actual knowledge of innocence. *See, e.g., Gay v. Wall*, 761 F.2d 175 (4th Cir. 1985).  But,

there are no allegations that Dickerson had actual knowledge of Johnson's innocence. That the fingerprints came back negative did not necessarily exonerate plaintiff.

Construing the facts alleged in the light most favorable to the plaintiff, there is nothing in the Amended Complaint to suggest Dickerson possessed evidence that he knew was "clearly exculpatory." And, in order for an officer to have acted with deliberate indifference, the officer must be "in possession of exculpatory evidence." *Tate*, 2019 WL 446594, at *6.

The Amended Complaint does not allege that Dickerson had the photograph of the other Reginald Johnson. Rather, plaintiff claims only that Dickerson could have and should have obtained it. The only evidence plaintiff alleges Dickerson actually possessed was the negative fingerprint screen. But, there are any number of reasons why a negative fingerprint screen might not be exculpatory. It may have been that the fingerprint screen was not inclusive of prints from other jurisdictions,[9] and a negative result would not necessarily mean that plaintiff was not the person named in the warrant. Similarly, even if the screen were inclusive of other jurisdictions, it

---

[9] As noted, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole*, 499 F.3d at 1225; *cf. Jeandron*, 510 F. App'x at 227 (noting that the court may take judicial notice of information on a website, "so long as the web site's authenticity is not in dispute").

In 2015, the Obama Administration issued a report indicating that "the majority of the estimated 600 disparate [fingerprint databases] at the Federal, state, and local levels are not interoperable from a technical or governance standpoint. As a result, data sharing is infrequent and case-specific, rather than routine. The sharing that does occur happens primarily through siloed channels in an established hierarchy from local to state to the FBI's [database]. Local law enforcement agencies often search only their own [databases], sometimes search their state's [database], and rarely share data with neighboring jurisdictions." Achieving Interoperability for Latent Fingerprint Identification in the United States, Committee on Science Subcommittee on Forensic Science of the National Science and Technology Council, (April 2015), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/NSTC/latent_ fingerprint_report_may_2015.pdf. P. 9

is entirely plausible that the real fugitive's fingerprints were not on file (if, for example, he was a first-time offender).

Plaintiff does not include any facts in the Amended Complaint as to what the negative fingerprint screen actually meant. For example, he does not say whether his prints were run through a national or state database. Nor is the Amended Complaint clear that Dickerson knew about the negative fingerprint screen before he decided to hold Johnson.

Even if the negative fingerprint screen had been clearly exculpatory, plaintiff does not allege facts suggesting that his subsequent detention was in violation of procedure. The Amended Complaint does not contain any facts as to Central Booking's procedure for releasing someone from custody, whether those procedures were violated, or who had the authority to order plaintiff released once an officer came into possession of exculpatory evidence.

Further, the Amended Complaint does not allege that Dickerson failed to pursue an investigation into Johnson's claim of innocence. Rather, plaintiff complains that the investigation that confirmed his innocence took too long. Although this incident did not take place over a holiday weekend, as in *Baker*, plaintiff was confined for about 51 hours. To be sure, it was undoubtedly very difficult for plaintiff to be held for any period of time. But, the length of the detention here does not rise to the level of a constitutional violation.

## IV.     Conclusion

For the aforementioned reasons, the Hammett Motion and the Dickerson Motion are granted.

A separate Order follows.

Date: December 23, 2019                                      _____/s/_____

Ellen L. Hollander
United States District Judge